1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANGELA LEWIS, individually and on
behalf of all others similarly situated

Plaintiff,

v.

CYTODYN, INC., et al.

Defendants.

CASE NO. C21-5190 BHS

ORDER ON MOTIONS TO
CONSOLIDATE ACTIONS,
APPOINT LEAD PLAINTIFF, AND
APPROVE SELECTION OF LEAD
AND LIASON COUNSEL

This matter comes before the Court on Movant Dr. Smila Kodali's motion to

consolidate actions, appoint lead plaintiff, and approve her selection of lead and liaison

counsel, Dkt. 22, and Movant Brian Joe Courter and Courter and Sons LLC's

(collectively "Courter") motion for consolidation of related actions, appointment as lead

plaintiff, and approval of selection of counsel, Dkt. 26. The Court has considered the

briefing filed in support of and in opposition to the motion and the remainder of the file

and hereby rules as follows.

# I.   FACTUAL & PROCEDURAL BACKGROUND

This action is a putative securities class action lawsuit against Defendant CytoDyn, Inc. and two of its executive officers, Defendants Nader Pourhassen and Michael Mulholland. Dkt. 1. The action asserts claims on behalf of a proposed class of all persons or entities who purchased or otherwise acquired CytoDyn common stock between March 27, 2020 and March 9, 2021 (the "Class Period"). *Id.* ¶ 1.

CytoDyn is a publicly traded biotechnology company headquartered in Vancouver, Washington and incorporated in Delaware. *Id.* ¶¶ 2, 14. Its business is primarily focused on the development and commercialization of a drug called Leronlimab, which has been promoted as a potential therapy for HIV patients. *Id.* Throughout 2019, CytonDyn's stock traded for less than $1.00 a share. *Id.* ¶ 4. Plaintiff alleges that, at the beginning of the COVID-19 pandemic in March 2020, CytoDyn began marketing Leronlimab as a treatment for COVID-19. *Id.* ¶¶ 3, 20. At its peak, on June 30, 2020, CytoDyn's stock reached over $10 per share. *Id.* ¶¶ 4, 29.

The class alleges that Defendants made materially false and misleading statements and failed to disclose material, adverse facts about CytoDyn's business and operations. *See id.* ¶¶ 20, 33, 38. Specifically, Plaintiff alleges that Defendants misrepresented and/or failed to disclose that CytoDyn had overstated the viability of Leronlimab as a COVID-19 treatment, that CytoDyn had engaged in a wrongful scheme with its lender, Iliad Research and Trading, L.P., and Iliad's principal, John Fife, in violation of the dealer registration requirements under federal securities law, and that CytoDyn had not actually requested emergency use authorization from the Food and Drug Administration for

Leronlimab as a COVID-19 treatment. *Id.* ¶¶ 43–44, 48–50. CytoDyn was accused of "massaging the data" in its Leronlimab study, and as a result the price of CytoDyn's shares dropped significantly. After closing at $4.05 on March 5, 2021, CytoDyn shares dropped over 28% to close at $2.91 on March 8, 2021. On March 9, 2021, CytoDyn shares dropped an additional 19% to close at $2.35. *Id.* ¶¶ 50–51.

Plaintiff Angela Lewis filed this action on March 17, 2021, alleging violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Dkt. 1. On April 9, 2021, a related securities class action was filed in *Goodwin v. CytoDyn, Inc., et al.*, No. 21-cv-05260-BHS-MLP. *Goodwin*, like this case, alleges violations of §§ 10(b) and 20(a) of the Exchange Act during the same Class Period. *See generally Goodwin*, No. 21-cv-05260-BHS-MLP, Dkt. 1, ¶¶ 1, 64, 75. Both actions bring claims on behalf of those who purchase or otherwise acquired CytoDyn stock during the Class Period and name the same Defendants. *See id.* ¶ 1. However, the plaintiff in *Goodwin* has since voluntary dismissed the case. *Id.*, Dkt. 16.

On March 18, 2021, Plaintiff Lewis (the first-filed Plaintiff) published notice pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(1)–(3)(B)(i), over *Globe Newswire*, a widely circulated national business-oriented wire service. *See* Dkt. 24-4. Members of the purported class have 60 days after the date on which the notice is published to move the court to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

1    On May 17, 2021, motions to consolidate cases and to appoint lead plaintiff and

2    approve selection of counsel were filed by Plaintiff Lewis, Dkt. 12, Movant Charles

3    Huang, Dkt. 14, Movants Candra Evans and Kenneth Kirschenbaum, Dkt. 17, Movant

4    Michael O'Donnell, Dkt. 19, Movant Ho "Matt" Chun, Dkt. 21, Movant Dr. Smila

5    Kodali, Dkt. 22, and Movants Brian Joe Courter and Courter and Sons, LLC, Dkt. 26.

6    Notices of non-opposition to competing lead plaintiff motions were then filed by

7    O'Donnell, Dkt. 41, Huang, Dkt. 43, Evans and Kirschenbaum, Dkt. 44, and Chun

8    withdrew his motion to appoint, Dkt. 42. Lewis did not file a response or a notice of non-

9    opposition.[1]

10    Thus, the remaining two movants for lead plaintiff are Kodali and Courter. On

11    June 1, 2021, both Kodali and Courter responded to the other Movants' motions. Dkts.

12    45, 47. On June 4, 2021, Kodali and Courter replied to the others' responses. Dkts. 50,

13    51. On June 9, 2021, Kodali filed a surreply, requesting that the Court strike footnote 6 of

14    Courter's reply brief and Exhibit D to the Reply Declaration of Bradley S. Keller. Dkt.

15    54.

16    Kodali and Courter contest who suffered the greater loss and therefore has the

17    largest financial interest in the relief sought by the class. On July 22, 2021, the Court

18    requested a surreply from Courter on the issue of proximate cause. Dkt. 56. On July 30,

19    2021, Courter filed the requested surreply. Dkt. 63.

20    _____

21    [1] "Except for motions for summary judgment, if a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit." Local Rules, W.D. Wash. LCR 7(b)(2). The Court construes Lewis's failure to respond to

22    be that she does not oppose the Court's appointment of Kodali or Courter as lead plaintiff.

## II.   DISCUSSION

### A.   Motion to Consolidate

"If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions." Fed. R. Civ. P. 42(a)(2). In determining whether to consolidate, a court "weighs the saving of time and effort consolidation would produce against any inconvenience, delay, or expense that it would cause." *Huene v. United States*, 743 F.2d 703, 704 (9th Cir. 1984).

While all movants agree that the *Goodwin* case should be consolidated with this action, *see, e.g.*, Dkt. 47 at 6 ("All movants agree that consolidation of the above-captioned actions is appropriate."), the plaintiff in *Goodwin* voluntarily dismissed their case, *see Goodwin*, No. 21-cv-05260-BHS-MLP, Dkt. 16. As such, there no longer exists a need to consolidate the cases. Movants' request to consolidate the actions is therefore DENIED as moot.

### B.   Motion to Appoint Lead Plaintiff

Kodali and Courter bring the remaining, unconceded motions to appoint lead plaintiff. They both argue that they possess the largest financial interest in the relief sought by the putative class and that they meet the requirements of Rule 23 to qualify as lead plaintiff.

The PSLRA "instructs district courts to select as lead plaintiff the one 'most capable of adequately representing the interests of class members.'" *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i)). The presumptively most adequate plaintiff is the plaintiff who has the greatest financial stake

in the outcome of the case and meets the requirements of Federal Rule of Civil Procedure 23. *See id.* The Ninth Circuit holds that the PSLRA provides a three-step process for identifying the lead plaintiff. *Id.* "The first step consists of publicizing the pendency of the action, the claims made[,] and the purported class." *Id.*

"In step two, the district court must consider the losses allegedly suffered by the various plaintiffs before selecting as the 'presumptively most adequate plaintiff'—and hence the presumptive lead plaintiff—the one who 'has the largest financial interest in the relief sought by the class' and 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" *Cavanaugh*, 306 F.3d at 729–30. In engaging in these inquiries, "the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Id.* at 730. The court "then focus[es] its attention on that plaintiff" and determines "based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id.*

At the third step, the court gives "other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.*

### 1.    Timely Notice and Motion for Appointment

The plaintiff who filed the first lawsuit must publish notice of the complaint in a widely circulated business publication within 20 days of filing the complaint. 15 U.S.C. § 78u-4(a)(3)(A)(l). In addition, all proposed lead plaintiffs must submit a sworn certification setting forth certain facts to demonstrate to the court that the plaintiff has

suffered more than a nominal loss, is not a professional litigant, and is otherwise

interested and capable of serving as a class representative. 15 U.S.C. § 78u-4(a)(2)(A).

Plaintiff Lewis was the first plaintiff to file suit, and she published notice in *Globe Newswire* on March 18, 2021. *See* Dkt. 17 at 18–19. Both Kodali and Courter filed their respective motions on May 17, 2021, within 60 days of Lewis's notice. In addition, both Kodali and Courter filed the required certification. *See* Dkt. 24-1 (Kodali's certification); Dkt. 27, Ex. A, at 7–9 (Courter's certification). Accordingly, both Kodali and Courter have satisfied this first step of the lead plaintiff inquiry. *See Cavanaugh*, 306 F.3d at 729.

### 2.    Presumptively Most Adequate Plaintiff

#### a.    Largest Financial Interest

In step two of the analysis, the court determines which movant has the largest financial interest in the litigation. *See id.* at 730. In making this determination, "the court may select accounting methods that are both rational and consistently applied." *Id.* at 730 n.4. Courts usually consider four factors: (1) total shares purchased, (2) net shares purchased, (3) net funds expended, and (4) approximate loss suffered. *See Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1075 (W.D. Wash. 2011).

Although the inquiry of who has the largest financial interest should a reasonably straightforward calculation, Kodali and Courter both assert that they have the largest interest. Courter claims a loss of $489,007 based on a last in, first out ("LIFO") basis, Dkt. 26 at 5, and Kodali claims a loss of $259,929 during the class period, Dkt. 22 at 2. Kodali challenges Courter's alleged loss and asserts that Courter failed to disclose his sale of shares during the Class Period. *See* Dkt. 45 at 5–9.

1    The trend among courts nationwide has been to use LIFO in calculating competing

2    movants' estimated losses. *See, e.g.*, *Nicolow v. Hewlett Packard Co.*, Nos. 12-05980

3    CRB, *et al.*, 2013 WL 792642, at *4 (N.D. Cal. March 4, 2013); *Bruce v. Suntech Power*

4    *Holdings Co.*, No. 12-4061, 2012 WL 5927985, at *2 (N.D. Cal. Nov. 13, 2012); *Foley v.*

5    *Transocean Ltd.*, 272 F.R.D. 126, 127–28 (S.D.N.Y. 2011). LIFO calculates losses by

6    assuming that the first stocks to be sold are the stocks purchased most recently prior to

7    that sale. An alternative methodology, "first in, first out" ("FIFO"), assumes that the first

8    stocks to be sold are the stocks that were acquired first, even if the stocks were acquired

9    outside the class period. "The main advantage of LIFO is that, unlike FIFO, it takes into

10    account gains that might have accrued to plaintiffs during the class period due to the

11    inflation of the stock price. FIFO . . . may exaggerate losses." *In re eSpeed, Inc. Sec.*

12    *Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005).

13    Based on LIFO methodology, Courter asserts that he suffered a loss of $489,007.

14    Kodali argues that the Court cannot actually determine Courter's "true financial interest"

15    because he "did not disclose the cost basis for his large pre-Class Period position in

16    CytoDyn securities" that he sold during the Class Period. Dkt. 45 at 5–6. She asserts that

17    Courter "selectively omitted more than $560,000 in gains from sales matched against

18    opening pre-Class Period position" and that "the gains from selling his pre-Class Period

19    holdings are so large that they will greatly reduce his claimed losses far below [] Kodali's

20    loss." *Id.* at 8, 9. Kodali largely relies upon *Cambridge Retirement System v. Mednax,*

21    *Inc.*, No. 18-61572-CIV-Dimitrouleas/Snow, 2018 WL 8804814 (S.D. Fla. Dec. 6, 2018),

22    and *Ferreira v. Funko, Inc.*, No. 2:20-cv-02319-VAP-PJWx, 2020 WL 3246328 (C.D.

Cal. June 11, 2020), to support her position. In *Funko*, for example, the court concluded that a movant failed to offset its claimed loss with gains for securities purchased before the class period and sold during the class period. 2020 WL 3246328, at *7. The *Funko* court further concluded that it could not calculate the movant's actual loss without knowing the basis of its pre-class period purchases and rejected that movant as lead plaintiff. *Id.*

But the Court can calculate Courter's actual loss based on LIFO methodology. When using LIFO to calculate the class period, courts do not typically offset the loss with pre-class period purchases and sales. As the Southern District of New York explained, "losses or gains on pre-class period holdings are typically not compensable, so should not be a focus of this determination." *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*, 269 F.R.D. 291, 295 (S.D.N.Y. 2010); *see also Johnson v. Dana Corp.*, 236 F.R.D. 349, 352 (N.D. Ohio 2006) (sales matched to pre-existing holdings are excluded from the damage calculation); *In re Comdisco Securities Litig.*, No. 01 C 2110, 2004 WL 905938, at *3 (N.D. Ill. Apr. 26, 2004) (finding LIFO consistent with the proper focus of purchases and sales during the class period). The Court agrees with Courter and the majority of courts across the country that LIFO is the appropriate methodology to use here as it is "the most accurate measure of actual losses suffered by stockholders in that it takes into account any gains accrued from sales during the class period." *City of Monroe*, 236 F.R.D. at 296. Courter's total losses using LIFO methodology are $489,006.64— greater than Kodali's loss of nearly $260,000. *See* Dkt. 27, Exs. A & B.

1    And although Courter concedes that he is a net seller, *see* Dkt. 51 at 9, it does not

2    appear that he is also a "net gainer." A net seller—one who sold more shares than

3    purchased during the class period—who suffered a loss can still prove damages and,

4    therefore, is still qualified to serve as lead plaintiff. *See, e.g.*, *Foley*, 272 F.R.D. at 132. A

5    movant who is both a net seller *and* a net gainer, on the other hand, typically is rejected

6    as lead plaintiff because they made gains, rather than losses, during the class period. *See*

7    *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996–97 (N.D. Cal. 1999). As

8    discussed above, Courter has suffered a loss during the Class Period, even though he sold

9    more shares than purchased. And even based on Kodali's methodology for calculating

10    Courter's loss (i.e., including the pre-Class period purchases in Courter's losses), Courter

11    would still have a loss of $196,450. Dkt. 51 at n.5.[2]

12    Kodali also argues that Courter's losses do not comply with *Dura*

13    *Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). *See* Dkt. 50 at 4–5. In *Dura*, the

14    Supreme Court held that in a securities fraud case, a plaintiff must show that the

15    defendant proximately caused plaintiff's losses by demonstrating that the

16    misrepresentations caused an inflation of the share price and that the "share price fell

17    significantly after the truth became known." 544 U.S. at 347. Although *Dura* concerned a

18    motion to dismiss, courts can apply *Dura* when considering financial interest for the

19

20    [2] Kodali moves to strike footnote 6 of Courter's reply brief and Exhibit D to the reply declaration, asserting that they include new arguments raised for the first time on reply. Dkt. 54. The Court disagrees. Courter's calculations presented in his reply are in direct response to

21    Kodali's asserted methodology for calculating his loss. And Kodali is not prejudiced by the Court's consideration of the "new" calculation as it supports her position that she has the higher

22    financial loss and as she filed a surreply and was able to respond to the "new" arguments.

1   purposes of appointing a lead plaintiff. *See In re LightInTheBox Holding Co., Ltd. Sec.*

2   *Litig.*, No. 13 CIV. 6016 PKC, 2013 WL 6145114, at *3 (S.D.N.Y. Nov. 21, 2013)

3   ("While the *Dura* court addressed a motion to dismiss, the Court's reasoning applies with

4   equal force to a motion to appoint lead counsel."). A court should therefore only consider

5   those losses that will "actually be recoverable in the class action." *Topping v. Deloitte*

6   *Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 617 (S.D.N.Y. 2015).

7          Kodali asserts that Courter's losses are incalculable as required by *Dura* because

8   Courter's losses were incurred prior to the disclosures about the alleged

9   misrepresentations. Specifically, she argues that Courter sold a total of 220,874 shares

10  prior to August 26, 2020, the date when the *Wall Street Journal* first reported that

11  CytoDyn was not being considered for the government's COVID-19 vaccine

12  development program.

13         The Court requested that Courter reply to this argument, as Kodali raised this issue

14  for the first time in her reply. Dkt. 56. In their surreply, Courter argues that the Court

15  should not apply *Dura* at this stage because the case includes multiple partial disclosures

16  which varied the fraud premium during the Class Period. Dkt. 63 at 4. In the alternative,

17  Courter argues that even if the Court does apply *Dura*, they would still have the largest

18  financial interest in the litigation. *Id.* at 5. Courter's *Dura*-compliant loss calculation is

19  further supported by an expert forensic economist. *See* Dkt. 64, Ex. B, Declaration of

20  Kenneth N. Kotz. In excluding gains and losses from Class Period shares that were sold

21  prior to the pled corrective disclosures, Courter still has the largest financial interest of

22  $471,201. Dkt. 63 at 5; Dkt. 64, Ex. B.

1    The Court concludes that the complaint does not allege multiple partial disclosures

2  and agrees with Kodali that applying *Dura* is appropriate at the lead plaintiff stage. The

3  Court recognizes, however, that further development of the class's claims may result in

4  allegations of recoverable losses, *see* Dkt. 63 at 4 n.5, but as alleged, the first disclosure

5  of misrepresentation occurred on August 26, 2020. Even so, Courter still has the largest

6  financial interest when applying *Dura* at this stage—he has suffered a verified loss of

7  $471,201 that was proximately caused by the disclosure Defendants' misrepresentations.

8  It could be revealed through the further development of this case that there were partial

9  disclosures that Courter's *Dura*-compliant losses are the full $489,007. But whether or

10 not *Dura* is applied, Courter is the movant with the largest financial loss.

11    Accordingly, the Court concludes that Courter has the largest financial interest.

12 *See Cavanaugh*, 306 F.3d at 730. The Court next analyzes whether Courter meets Rule

13 23's requirements, focusing particularly on typicality and adequacy. *See id.*

14          **b.     Rule 23 Requirements**

15    Rule 23 requires numerosity, commonality, typicality, and adequacy as

16 prerequisites to bringing a class action. *See* Fed. R. Civ. P. 23(a)(1)–(4). On a motion to

17 appoint a lead plaintiff, the court focuses solely on the typicality and adequacy

18 requirements. *Frias*, 835 F. Supp. 2d at 1075 (citing *Cavanaugh*, 306 F.3d at 730 n.5). A

19 court's "Rule 23 inquiry is not as searching as it would be on a motion for class

20 certification." *Schriver v. Impac Mortg. Holdings, Inc.*, No. SACV 06-31 CJC (RNBx),

21 2006 WL 6886020, at *5 (C.D. Cal. May 2, 2006). "[T]he prospective lead plaintiff need

22 only make a prima facie showing that it meets the typicality and adequacy factors." *Id.*

Courter satisfies both the typicality and adequacy factors. Typicality is generally shown when a class member's claims "arise from the same event or course of conduct which gave rise to the claims of the class members and are founded on the same legal theory." *Frias*, 835 F. Supp. 2d at 1075. Courter asserts that CytoDyn violated §§ 10(b) and 20(a) of the Exchange Act based upon, among others, Defendants' misrepresentation and/or failure to disclose that CytoDyn had overstated the viability of Leronlimab as a COVID-19 treatment. *See* Dkt. 26 at 6–8. Courter thus alleges injuries similar to those of the other putative class members and makes a prima facie showing that of the typicality requirement.

Courter is additionally adequate. A lead plaintiff is adequate if the plaintiff does not have any conflicts of interest with other putative class members and the plaintiff and his counsel will vigorously litigate on the class's behalf. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). There does not appear to be any conflicts between Courter and the other putative class member. Courter is not a movant group "composed of unrelated persons," as Brian Joe Courter is the co-owner and operator of Courter and Sons LLC. *See Frias*, 835 F. Supp. 2d at 1073–1075 (collecting cases); *cf. Arciaga v. Barrett Bus. Servs., Inc.*, Nos. C14-5884 BHS, *et al*., 2015 WL 791768, at *3 (W.D. Wash. Feb. 25, 2015) (rejecting movant group of unrelated persons). And Courter declares that they will vigorously pursue the claims on behalf of the class. *See* Dkt. 27. Ex. C, at 14–16; *see also Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 668 (C.D. Cal. 2005) (concluding that the movant was "an 'adequate' plaintiff because he has suffered the greatest financial loss, ensuring vigorous advocacy"). Finally, Courter has retained experienced and qualified

1  counsel. *See* Dkt. 27, Exs. E & F. Courter has thus made a prima facie showing of the
2  adequacy requirements.

3  Because Courter has the largest financial interest in this litigation and has made a
4  prima facie showing of the Rule 23 requirements, the Court concludes that Courter is the
5  presumptively most adequate plaintiff.

6  **3.  Rebuttal of Presumption**

7  In the third step of the lead plaintiff determination process, the court must "give
8  other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it
9  satisfies Rule 23's typicality and adequacy requirements." 15 U.S.C. § 78u-
10  4(a)(3)(B)(iii)(II); *Cavanaugh*, 306 F.3d at 730. The presumption of adequacy "may be
11  rebutted only upon proof . . . that the presumptively most adequate plaintiff" does not
12  satisfy the adequacy or typicality requirements of Rule 23. 15 U.S.C. § 78u-
13  4(a)(3)(B)(iii)(II); *Cavanaugh*, 306 F.3d at 729 n.2. If the presumptive lead plaintiff does
14  not meet the typicality or adequacy requirement, the Court determines whether the
15  plaintiff with the next highest stake in the litigation has made a prima facie showing of
16  typicality and adequacy. *Cavanaugh*, 306 F.3d at 731. "If so, it must declare that plaintiff
17  the presumptive lead plaintiff and repeat step three of the process by giving other
18  plaintiffs an opportunity to rebut that showing. This process must be repeated
19  sequentially until all challenges have been exhausted." *Id.*

20  Kodali does not try to rebut that Courter's adequacy and typicality, and instead
21  largely focuses her arguments on whether Courter has the largest financial interest.
22  Kodali raises in passing whether appointing Courter as lead plaintiff would create Article

III standing issues, as Courter is comprised of Brian Joe Courter and Courter and Sons LLC (of which Brian Joe Courter is a co-owner). Dkt. 45 at 6 n.2. But as Courter clarifies in reply, Brian Joe Courter is not seeking to bring claims on behalf of himself and a limited liability company, rather Brian Joe Courter and Courter and Sons LLC are seeking to jointly serve as lead plaintiff. Dkt. 51 at 6 n.2. Because she does not address Courter's typicality or adequacy, Kodali has thus failed to rebut that Courter is the presumptively most adequate plaintiff. Courter's motion for appointment as lead plaintiff is, therefore, GRANTED.

## C.    Approval of Lead Plaintiff's Choice of Counsel

The PSLRA provides that the most adequate plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). If the lead plaintiff makes "a reasonable choice of counsel, the district court should generally defer to that choice." *Cohen v. U.S. Dist. Court for N. Dist. Of Cal.*, 586 F.3d 703, 712 (9th Cir. 2009). A court may reject the lead plaintiff's choice of counsel, but the court does not have "the authority to select lead counsel of its own choosing." *Id.* at 709. The court therefore has only "the limited power to accept or reject the lead plaintiff's selection." *Id.*

Courter has selected Kessler Topaz Meltzer Check, LLP ("Kessler Topaz") as lead counsel and Byrnes Keller Cromwell, LLP ("Byrnes Keller") as liaison counsel and has submitted both firms' resume to the Court. Dkt. 27, Exs. E & F. The Court concludes that Kessler Topaz's resume indicates that the firm is well-qualified to serve as lead counsel particularly because Kessler Topaz specializes in complex class action litigation and has

1   represented clients in many class action securities cases. *See id.*, Ex. E. Byrnes Keller is

2   additionally qualified to serve as liaison counsel as it has substantial experience in

3   complex litigation and securities cases. *See id.*, Ex. F. The Court therefore approves

4   Courter's selection of Kessler Topaz as lead counsel and Byrnes Keller as liaison

5   counsel. Courter's motion for approval of selection of counsel is therefore GRANTED.

6   ### III.  ORDER

7   Therefore, it is hereby **ORDERED** that Movant Kodali's motion to consolidate

8   actions, appoint lead plaintiff, and approve her selection of lead and liaison counsel, Dkt.

9   22, is **DENIED** and that Movant Courter's motion for consolidation of related actions,

10  appointment as lead plaintiff, and approval of selection of counsel, Dkt. 26, is

11  **GRANTED in part** and **DENIED as moot in part**. It is further **ORDERED** that

12  Movants Lewis, Dkt. 12, Huang, Dkt. 14, Kirschenbaum and Evans, Dkt. 17, and

13  O'Donnell's, Dkt. 19, individual motions for appointment as lead plaintiff and approval

14  of selection of counsel are **DENIED as moot**.

15  The parties shall update the caption to reflect the selected lead plaintiff.

16  Dated this 19th day of August, 2021.

17

18

19  BENJAMIN H. SETTLE
    United States District Judge

20

21

22