UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRIAN COURTER, et al.,

                    Plaintiff,

        v.

CYTODYN, INC., et al.,

                    Defendants.

CASE NO. C21-5190 BHS

ORDER

        THIS MATTER is before the Court on defendants CytoDyn, Inc., Michael Mulholland and Scott Kelly's motion to dismiss plaintiff Brian Courter,[1] et al.'s second amended class action complaint, Dkt. 116. Defendant Pourhassan joins the motion, Dkt. 123.

        The putative plaintiff class asserts four Securities Act claims based on the defendants' allegedly false and misleading statements about CytoDyn's Investigational

---

[1] There are six named plaintiffs, all seeking to represent a class of similarly situated purchasers of CytoDyn stock during the Class Period, between March 27, 2020, and March 30, 2022. This Order refers to the plaintiffs as "Courter" in the singular for clarity and ease of reference, unless the context requires otherwise.

New Drug (IND), "Leronlimab." Defendants move to dismiss the bulk of Courter's claims.

## I.    BACKGROUND

CytoDyn[2] is a Vancouver, Washington based biotechnology company. Its primary drug candidate is Leronlimab, which it describes as a "humanized monoclonal antibody" that it is developing for a variety of potential uses. Dkt. 116 at 7. Mulholland was CytoDyn's Chief Financial Officer (CFO) from December 2012 to May 2021. Kelly was a CytoDyn director, Chairman of the Board, and Chief Science Officer over time, from April 2017 to December 19, 2022. Nader Pourhassan was the CEO, president, and a member of the board from 2101 to January 2022.

Courter alleges that CytoDyn, Pourhassan, Mulholland, and Kelly materially misled investors about the progress and success of its ongoing efforts to obtain FDA approval for use of its sole drug, "Leronlimab," as a treatment for HIV and, later, for COVID-19. Courter alleges CytoDyn made false statements and failed to disclose important information to increase CytoDyn's stock price, and that he was damaged when the price fell because the true, dismal state of those efforts was revealed.

Courter alleges CytoDyn's false statements arose in two overlapping contexts, over two years. The first context is CytoDyn's efforts to persuade the market that its HIV "biologic license application (BLA)" to the FDA was complete and that approval was imminent, to prop up CytoDyn's stock price. Courter contends that CytoDyn misled

---

[2] The Order similarly refers to all four named defendants as "CytoDyn" except where the context requires otherwise.

1   investors about its lengthy efforts to obtain FDA approval for Leronlimab as an HIV

2   treatment. He contends CytoDyn publicly stated on April 27, 2020, that the HIV BLA

3   was "complete" when it was not; CytoDyn had not provided data, information and

4   analyses the FDA had already told CytoDyn was required. Courter alleges the FDA

5   privately told CytoDyn on April 29, 2020, that its BLA submission was *not* complete and

6   asked it to "take responsibility for the misinformation." Dkt. 132 at 14 (citing Courter's

7   second amended complaint, Dkt. 103, at 41).

8         Courter alleges that the stock price spiked because of CytoDyn's announcement,

9   and that Pourhassan and Kelly exercised options to sell stock for almost $19 million

10  between April 30 and May 4, 2020. CytoDyn did not acknowledge that its HIV BLA was

11  in fact incomplete until May 4, which Courter contends predictably sent the stock price

12  back down. CytoDyn supplemented its HIV BLA submission in May and told investors

13  that the BLA was now complete, even though it knew it lacked the required safety and

14  dosage data.

15        On July 8, 2020, the FDA sent CytoDyn a nonpublic "Refuse to File (RTF)" letter,

16  explaining that the May submission "had numerous omissions and inadequacies so severe

17  as to render the application incomplete[.]" Dkt. 132 at 14 (citing Dkt. 103 at 45–46).

18  Courter alleges that the letter meant that CytoDyn could not submit a complete HIV BLA

19  without conducting an additional clinical trial. CytoDyn publicly announced it had

20  received the RTF letter, but Courter alleges it knowingly misrepresented the letter's

21  contents and its ability to timely resubmit the BLA. *Id.* On July 13, 2020, CytoDyn

22  issued a Press Release (and held an investment community conference call) asserting that

1  the FDA would not require more clinical trials, and that CytoDyn was "confident it can

2  provide all information requested by the FDA." *See* Dkt. 177 at 24–28 and 30–48.

3  Courter asserts that these statements were knowingly false.

4      The second context for CytoDyn's allegedly false statements relates to its efforts

5  to obtain FDA approval to use Leronlimab as an Investigational New Drug (IND) to treat

6  COVID-19. Courter's claims arise primarily from statements related to its early

7  emergency IND (eIND) use, and two subsequent clinical trials, CD10 and CD12.

8  CytoDyn released the results of CD10 at the end of July 2020. While the study missed its

9  primary endpoint, Courter asserts that CytoDyn falsely assured investors that the "more

10  important" and "statistically significant" results for the National Early Warning Score2

11  (NEWS2) scale secondary endpoint demonstrated that Leronlimab was effective and that

12  CytoDyn had "requested Emergency Use Authorization (EUA)" based on the results of

13  CD10. Dkt. 132 at 15.  Courter contends that these statements were false; CytoDyn knew

14  the NEWS2 data was instead clinically meaningless, that CD10 did not support further

15  FDA action, and that CytoDyn had not requested EUA. CytoDyn admitted this latter

16  point on September 16, 2020, and the stock declined. *Id*.

17      Courter contends that CytoDyn's efforts continued with a second clinical trial,

18  CD12, which tested Leronlimab's efficacy for critically ill COVID-19 patients. He

19  alleges CytoDyn "unblinded" this clinical trial on February 12, 2021, and that CD12

20  missed all its endpoints. Nevertheless, CytoDyn sent the FDA an Executive Summary

21  seeking EUA for critically ill COVID-19 patients based on analysis of CD12 subgroups

22  four days later. On February 18, the FDA denied the EUA because the subgroup analyses

did not support efficacy and CytoDyn's emphasis on favorable trends in them was "potentially misleading." *Id*. CytoDyn revised and resubmitted its request for EUA on February 23. On February 25, the FDA responded that CD12 was not sufficient to support EUA and that the trial did not demonstrate Leronlimab's efficacy. *Id*.

Courter alleges that CytoDyn told investors about the CD12 results on March 8, 2021, and the stock price declined. But CytoDyn also told investors that CD12 demonstrated Leronlimab was effective and that it had sought EUA. Courter alleges that the FDA issued in response a "devastating" "Statement on Leronlimab" on May 17, 2021, explaining that the currently available data did not support the clinical benefits of Leronlimab for COVID-19. Dkt. 117 at 5. He asserts that CytoDyn nevertheless continued to falsely represent to investors that the drug was on a path to FDA approval, and Pourhassan falsely told investors that none of CytoDyn's prior statements were inconsistent with the FDA's Statement. Dkt. 132 at 16.

Courter contends that CytoDyn continued to publicly, and falsely, claim that the FDA was not requiring another clinical trial for the HIV BLA, and that CytoDyn already had the data needed to complete the BLA. *Id*. Instead, he claims, CytoDyn and its officers had internally recognized that they did not have the necessary data, and that they would need another trial—a process complicated further by the fact that it had lost access to some of its prior data held by a third party, Amarex. *Id*. He alleges that CytoDyn knew it faced a risk of a "clinical hold" for both its HIV and COVID-19 Leronlimab programs due to the missing and inaccessible data by September 2021, but did not admit that fact to investors until March 30, 2022 (the last day of the class Period), when it announced that

1    the FDA had placed "clinical holds" on both the HIV and COVID-19 IND programs,

2    prompting another decline in the stock price. *Id.*

3        Courter asserts that CytoDyn's efforts to increase the price of CytoDyn's stock

4    through false representations about the success of Leronlimab violated the Securities

5    Exchange Act, and he asserts four claims: a Section 10b (SEC Rule 10b-5(b)) claim

6    against all defendants for "making" false and misleading statements about CytoDyn's

7    efforts to obtain FDA approval for Leronlimab (Count I); a Section 10b (SEC Rule 10b-

8    5(a) and (c) claim against all defendants for a fraudulent scheme to "promote" the

9    misleading and false statements (Count II); a Section 20a claim against the three

10   individual defendants as "control persons" liable for CytoDyn's 10b violations (Count

11   III); and a section 20A claim against the individual defendants for insider trading (Count

12   IV). Courter seeks to represent a class of similarly damaged investors between March 27,

13   2020, and March 30, 2022. Dkt. 103.

14       CytoDyn seeks dismissal of most of Courter's claims, arguing primarily that he

15   has not sufficiently alleged that the statements upon which he relies were false or

16   misleading, measured against the "formidable" pleading requirements of the Private

17   Securities Litigation Reform Act (PSLRA) and Federal Rule of Civil Procedure 9(b). Id.

18   at 9 (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th

19   Cir. 2008)). It argues that Courter had failed to plead specific facts supporting a strong

20   inference of scienter and emphasizes that, in contrast to the Court's "typical" Rule

21   12(b)(6) analysis, it must consider plausible, nonculpable explanations for the

22   defendants' conduct, and account for "plausible opposing inferences." Dkt. 116 at 10

(citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007). Its

defense rests primarily on its claim that Courter must plead scienter for *each defendant*,

and must set forth, "in great detail, facts that constitute strong circumstantial evidence of

deliberately reckless or conscious misconduct." *Id*. (citing *Glazer Capital Mgmt., LP v.

Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). CytoDyn argues that Courter's complaint

ignores the context in which the many statements at issue were made. It asks the Court to

Dismiss the bulk of Courter's claims against it, Mulholland, and Kelly. Dkt. 116.

Pourhassen joins most of the motion and seeks dismissal of most of Courter's claims

against him. Dkt. 123.

The issues are addressed in turn.

## II.    DISCUSSION

### A.    Pleading standards for Courter's Section 10b claims.

Dismissal under Fed. R. Civ. P. 12(b)(6) may be based on either the lack of a

cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A

plaintiff's complaint must allege facts to state a claim for relief that is plausible on its

face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility"

when the party seeking relief "pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although

the court must accept as true the complaint's well-pled facts, conclusory allegations of

law and unwarranted inferences will not defeat an otherwise proper 12(b)(6) motion to

dismiss. *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v.

1    *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "A plaintiff's obligation to

2    provide the grounds of his entitlement to relief requires more than labels and conclusions,

3    and a formulaic recitation of the elements of a cause of action will not do. Factual

4    allegations must be enough to raise a right to relief above the speculative level." *Bell Atl.*

5    *Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). This requires a plaintiff to

6    plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*,

7    556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

8        On a 12(b)(6) motion, "a district court should grant leave to amend even if no

9    request to amend the pleading was made, unless it determines that the pleading could not

10   possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal.*

11   *Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). However, where the facts are not in

12   dispute, and the sole issue is whether there is liability as a matter of substantive law, the

13   court may deny leave to amend. *Albrecht v. Lund*, 845 F.2d 193, 195–96 (9th Cir. 1988).

14       CytoDyn correctly contends the PSLRA and Federal Rule of Civil Procedure 9

15   require Courter to allege with specificity six elements to plausibly plead a Section 10(b)

16   claim: (1) a material misstatement or omission; (2) scienter; (3) purchase or sale of a

17   security; (4) reliance; (5) economic loss; and (6) loss causation. Dkt. 116 at 9 (citing

18   *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). It

19   argues that Courter must identify each misleading statement and the reason why it is

20   misleading, including an articulation of facts showing that the statement was false when it

21   was made. *Id.*

22

**B.    Count I – Section 10(b) false statements (Rule 10b-5(b)).**

Courter's primary claim is that CytoDyn's statements about its ongoing efforts to obtain FDA approval for the use of Leronlimab to treat HIV and then COVID-19 were false and misleading, and violated Section 10(b) of the Securities Act. His operative second amended complaint thoroughly catalogues the public statements CytoDyn made through Pourhassan and others. Dkt. 103. He argues he has amply pled the elements of his Section 10(b)-based claims: defendants "made," (Rule 10b-5(b), "disseminated" or "promoted," (Rule 10b-5(a) and (c)), materially false and misleading statements regarding CytoDyn's HIV BLA and COVID-19 IND with scienter, and the stock price declined when the truth was revealed over "six partially corrective events," which removed the stock price inflation caused by the falsities. Dkt. 132 at 17.

The motion is unusual in that CytoDyn's statements (and the FDA's responsive statements and actions) are well-documented, and CytoDyn does not dispute that they were made. Instead, it argues that, viewed in context, most of the statements are not actionable.

The Court agrees that the context is important but concludes that in context Courter has plausibly pled that CytoDyn's statements were false or misleading. The motion to dismiss Courter's Rule 10b-5(b) is **DENIED**.

**1.    CytoDyn's HIV BLA statements.**

CytoDyn argues that Courter has not sufficiently alleged that its statements regarding its BLA were materially false or misleading. It argues that it did in fact submit its HIV BLA to the FDA on April 27, 2020, and supplemented its data in support of that

1    filing May 11, and that nothing in its statements about those events "guaranteed" that the

2    FDA would approve the BLA. Dkt. 116 at 10. Instead, it contends, the challenged

3    statements suggested  to a reasonable investor that there would be additional dialogue

4    with the FDA: "*As a next step*, the FDA will start reviewing the BLA for completeness[.]

5    … *After the BLA submission is deemed completed*, the FDA assigns a [PDUFA] goal

6    date." *Id*. (emphasis in CytoDyn's motion). It argues reasonable investors would

7    anticipate that such a submission would lead to a dialogue involving the presentation of

8    differing views. *Id*. (citing *In re Dynavax Sec. Litig*., 2018 WL 2554472, at *7 (N.D. Cal.

9    June 4, 2018) and *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016)).

10        Courter responds that CytoDyn's unequivocal statement that the BLA was

11    "complete" was materially false and misleading; CytoDyn lacked data, information, and

12    analyses that the FDA had already told it would be critical components of a complete

13    BLA submission, and CytoDyn in fact never provided that information. Dkt. 132 at 18.

14    Courter alleges that when CytoDyn made its public statements, it possessed the FDA's

15    non-public correspondence advising it that it needed specific safety and dosage data, and

16    that it did not have that data, and that its April BLA submission cover letter specifically

17    identified the missing information. *Id*. And it emphasizes that by April 30 the FDA had

18    told Pourhassan it was concerned his statements about the BLA's status as "complete"

19    were "misleading." It argues that the statements were therefore false or misleading when

20    they were made. *Id*. (citing *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 62 F.4th

21    747, 764 (9th Cir. 2023) ("A statement is false or misleading if it directly contradict[s]

22    what the defendant knew at the time or omits material information"); and *Zak v. Chelsea*

1    *Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015) (allegations permitted strong

2    inference that defendants "misled investors by failing to disclose critical information

3    received from the FDA…while releasing less damaging information [] they knew was

4    incomplete."). Courter argues, persuasively, that CytoDyn's claim that investors knew

5    that the dialogue was "ongoing" does not negate the Courter's allegation that the FDA

6    had already told it that its submission was far from complete.

7        The heightened pleading standard does not require Courter to allege that CytoDyn

8    "guaranteed" that the FDA would approve Leronlimab; it requires him to plausibly allege

9    that CytoDyn's statements were knowingly false or misleading when made. Courter

10    correctly contends that investors' presumed knowledge of an ongoing dialogue with the

11    FDA does not negate the fact that CytoDyn's statements about what had already occurred

12    were incomplete and untrue; it had not provided the FDA basic, critical data it knew was

13    needed to make its BLA complete.

14        The same is true with respect to CytoDyn's statements after it received the FDA's

15    RTF letter. Courter has specifically and plausibly pled that the BLA was still not

16    "complete" after the May 2020 submission, that the FDA did not seek only "additional

17    information" about an ongoing trial, and that it had all the data it required and thus would

18    not have to do any more clinical trials. Courter asserts that these statements were

19    materially misleading and false: the submission was not complete, the FDA's RTF letter

20    sought information it had been seeking since 2018, and it did *not* inform CytoDyn that

21    additional clinical trial were unnecessary. Instead, Courter has specifically and plausibly

22    pled that CytoDyn knew, and did not disclose, that it did not have the safety and dosage

1   data the FDA insisted it needed, and that it could not get that data without additional

2   trials. Dkt. 132 at 19–20 (citing *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704

3   (9th Cir. 2016) (because Arena did not have "all of the data in hand," it "could not, in

4   fact, support" its statements when made.)). *See also In re CV Therapeutics, Inc. Sec.*

5   *Litig.*, 2004 WL 1753251, *7 (N.D. Cal. Aug. 5, 2004) (statements misrepresenting data

6   in NDA and "affirm[ations] that nothing…made [defendant] believe that another study

7   would be needed" actionable); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d

8   335, 346 (E.D. Pa. 2014) (false statements about FDA's position on new trial actionable);

9   *Shanawaz*, 348 F. Supp. 3d at 325 (claims sustained where data at issue was not

10  "submitted…to the FDA [] despite" defendants' statements). *Id.*

11          Courter also argues that because CytoDyn disclosed some of the RTF letter's

12  "outstanding review issues," it was "obligated to share the other significant review

13  issues." *Id.* at 20 (citing *Pardi v. Tricida, Inc.*, 2022 WL 3018144, *13 (N.D. Cal. July

14  29, 2022). He argues that CytoDyn "hid the ball" from investors by the FDA's prior

15  guidance about its BLA was an explicit reason for the RTF letter. *Id.* (citing *Pardi* at *13,

16  and *In re Atossa Genetics Inc. Sec. Litig.*, 868 F3d 784, 797-98 (9th Cir. 2017)

17  (statements about FDA letter "misleading" where Defendants "studiously avoided

18  disclosing" material information it contained).

19          CytoDyn argues primarily that it disclosed the RTF letter, which as Courter

20  emphasizes, was itself the most important and disappointing news about the BLA, and as

21  Courter alleges, CytoDyn's stock price fell on that news. It contends that Courter

22  inappropriately focuses on sentences and phrases "divorced" from the context of the

1  unambiguously negative RTF letter. Dkt. 116 at 12 (citing *Berson v. Applied Signal*

2  *Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (statement is misleading only "if it would

3  give a reasonable investor the 'impression of a state of affairs that differs in a material

4  way from the one that actually exists'")).

5          Courter correctly contends that this argument is a "truth on the market (TOTM)"

6  affirmative defense, a method of refuting an alleged misrepresentation's materiality. Dkt.

7  132 at 21 (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481 (2013)).

8  He argues that the TOTM defense excuses a defendant's failure to disclose material

9  information ***only*** where a defendant shows ***that*** information was publicly transmitted …

10  with a degree of intensity and credibility sufficient to effectively counterbalance any

11  misleading impression created by [defendants'] one-sided representations." *Id*. at 21

12  (citing *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008)

13  (emphasis added)). Indeed, it asserts that TOTM "is intensely fact-specific, so courts

14  rarely dismiss…on this basis," *id.*, and "defendants bear a heavy burden of proof." *Id.*

15  (citing *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)).

16          CytoDyn argues that its statements that the BLA was "complete" were not

17  misleading because there is no reason an investor would view them as material; they were

18  about the prior BLA submission, upon which the FDA had already taken negative action.

19  Dkt. 137 at 8. It argues it was not misleading to say the FDA would require no new

20  clinical trials because, as Courter acknowledges, the FDA did not say that further trials

21  were required. Instead, additional data was required, and CytoDyn simply stated that

22  "planned" to resubmit with additional data. *Id*.

1    But Courter has plausibly pled that CytoDyn knew it did not have such data, and

2  could not get, and thus submit, such data without conducting additional clinical trials.

3  CytoDyn's filings do not claim that it could have done so, and it is apparently undisputed

4  that it did not do so. He has plausibly alleged that CytoDyn's statements about its BLA

5  after the RTF letter gave reasonable investors an impression of a state of affairs that

6  differed in a material way from the one that existed. *See Berson v. Applied Signal Tech.,*

7  *Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). CytoDyn's argument that Courter's claims rely

8  on a "fraud in hindsight" theory, because CytoDyn's "predictions" about the future

9  turned out to be wrong, Dkt. 137 at 8, is similarly unpersuasive. His claim is not that

10  CytoDyn's statements about its BLA turned out to be wrong when the FDA placed a

11  clinical hold on its HIV program two years later. Instead, he plausibly claims that

12  CytoDyn's statements in the aftermath of the RTF letter were false and misleading when

13  they were made; the BLA submission was never complete, a compete submission always

14  required data that CytoDyn did not have and could not get without an additional clinical

15  trial.

16    Even against the heightened pleading standards applicable to his claim, Courter

17  has plausibly alleged that CytoDyn's statements regarding the HIV BLA were false and

18  misleading, based on what CytoDyn knew at the time the statements were made.

19  CytoDyn's motion to dismiss Count I based on its BLA statements is **DENIED**.

20

21

22

1          **2.     CytoDyn's COVID-19 statements.**

2          Courter asserts that CytoDyn misled investors about Leronlimab's potential to

3   treat COVID-19 in the respects: (1) the FDA's emergency use authorization, (2) the

4   results of the CD10 clinical trial, and (3) the results of the CD12 clinical trial.

5          CytoDyn also seeks dismissal of Courter's Section 10(b) claim based on its

6   statements about its attempts to obtain FDA approval to use Leronlimab to treat COVID-

7   19. It argues the complaint ignores the more important context of the challenged

8   statements. Dkt. 116 at 12.

9          **a.     CytoDyn's COVID-19 eIND statements.**

10         First, CytoDyn argues that it disclosed that the FDA would no longer issue eINDs

11  and that it instead recommended it conduct a randomized controlled trial. It argues that

12  Courter has failed to plausibly plead why this plainly negative news would not be

13  dispositive to a reasonable investor. Dkt. 116 at 12. It argues Courter's claims that the

14  accompanying statements were misleading fail because federal securities law does not

15  require companies to disparage their own product lines, Dkt. 116 at 13 (citing *Kane v.*

16  *Madge Networks N.V.*, 2000 WL 33208116, at *8 (N.D. Cal. May 26, 2000), *aff'd sub*

17  *nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002)), especially when it has provided

18  accurate hard data from which investors can draw their own conclusions. *Id.* (citing

19  *Romine v. Acxiom Corp.*, 296 F.3d 701, 708 (8th Cir. 2002)).

20         Courter argues that CytoDyn falsely and misleadingly told investors that the eIND

21  data "demonstrated" Leronlimab's "mechanism-of-action" (MoA)—how it worked—and

22  its efficacy, supported the FDA's decisions regarding the COVID-19 IND, and supported

1  EUA. He asserts CytoDyn knew at the time it made the statements it knew they were

2  materially false because it knew from nonpublic FDA correspondence that these claims

3  were false: CytoDyn's data was "in-vitro," "uninterpretable," and "uncontrolled," and

4  thus could not "demonstrate" Leronlimab's efficacy or its MoA, and could not support

5  further FDA action, including EUA. Dkt. 132 at 23.

6       Courter argues that statements are actionable where "[c]ontrary to [defendant's]

7  representations to investors[,] it was not true that [in-vitro data] demonstrated" a drug's

8  efficacy, Dkt. 132 at 23 (citing *Arena*, 840 F.3d at 708), and where defendants publicly

9  tout trial results the knew were likely unreliable. *Id*. (citing *Khoja*, 899 F.3d at 1010). He

10  argues, persuasively, that CytoDyn falsely told investors it "understood how the drug

11  worked." *Id*. (citing *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, *9

12  (S.D.N.Y. Feb. 1, 2005)).

13      Courter argues CytoDyn's public statements were false or misleading because

14  while it knew the eIND data was clinically meaningless, it continued to misrepresent the

15  import of the data including implying that it supported the FDA's decisions: the FDA

16  gave a "green light" to CD10 and CD12 based on the eIND data. *Id*. Courter argues the

17  evidence the statements were material to investors is that analysts seized on them ("FDA

18  may endorse Leronlimab based on eIND alone;" report increasing target price, touting

19  Leronlimab's "newly discovered effectiveness in treating COVID-19"), and the stock

20  price went up in response. Dkt. 132 at 24. He accurately argues that information about a

21  potential drug's efficacy and the likelihood of FDA approval is critical and thus material,

22

1    and that CytoDyn's statements that the eINDs demonstrated efficacy were false because

2    the FDA had expressed doubts about the reliability of its data. Dkt. 132 at 24

3        Courter responds to the claim CytoDyn was not obligated to focus on the

4    disappointing part of the news by citing on-point cases explaining that once it chose to

5    tout "positive" information, it was obligated to disclose the adverse information. *Id*. at 25

6    (citing *Arena*, 840 F.3d 706–706). Courter argues that, in context, CytoDyn was required

7    to disclose that the eIND data was likely unreliable, and that the FDA had already told it

8    that results with a high degree of uncertainty would not support FDA action. *Id*. (citing

9    *Khoja*, 899 F.3d at 1010). He argues once it chose to speak on its interactions with the

10   FDA, CytoDyn was obligated to disclose the FDA's concerns that it needed in-vivo

11   clinical data to render its statements not misleading. *Id*. (citing *Freedman v. St. Jude*

12   *Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014); *Arena*, 840 F.3d 705-06; *Amylin*,

13   2003 WL 21500525 at *8 (defendants obligated to disclose the need for "validat[ion]

14   through a clinical study" and lack of "in-vivo [or] clinical data.")).

15       Courter also persuasively disputes CytoDyn's claim that the news that the FDA

16   would not authorize further EUA for COVID-19 was "dispositive" to a reasonable

17   investor, making immaterial any accompanying optimism. He asserts that this version of

18   CytoDyn's TOTM defense fails because the statements were made prior to the date (June

19   2, 2020) that the FDA's eIND decision was made public. *Id*. (citing *City of Birmingham*

20   *Relief and Ret. Sys. v. Acadia Pharm., Inc.*, 2022 WL 4491093, *11 (S.D. Cal. Sept. 27,

21   2022) (TOTM defense rejected where information was "release[d]… after the first

22   allegedly misleading statement"). And for statements after that disclosure, the FDA's

1    decision not to authorize further eINDs was not the omitted material; it was the fact the

2    data gathered from the eINDs already conducted was meaningless.

3        Finally, Courter argues that Pourhassan's June 2020 statements about the eINDs

4    were actionable because they were created the misleading impression that the FDA's

5    decision reflected a belief the Leronlimab was effective for COVID-19. In truth, Courter

6    contends, the FDA shut down CytoDyn's "*de facto*" Leronlimab "compassionate use

7    study" premised on an unacceptably high number of eINDs, to ensure CytoDyn

8    "focused" on obtaining in-vivo clinical data that it did not yet have, to demonstrate

9    efficacy. Dkt. 132 at 26. And, Courter emphasizes, he plausibly pleads that the FDA told

10    CytoDyn that its statements were misleading and required it to "acknowledge that the

11    [FDA] has repeatedly informed CytoDyn that [it has] not been able to establish clinical

12    proof-of-concept for Leronlimab for COVID-19" and that "[u]ncontrolled [e]IND data

13    are not adequate[.]" He argues that such a rebuke in response to its statements make the

14    statements materially false. *Id*. (citing *In re Dura Pharms. Inc. Sec. Litig.*, 548 F. Supp.

15    2d 1126, 1137 (S.D. Cal. 2008)). He argues that revealing only the FDA's decision to

16    stop authorizing eINDs "did not effectively counter-balance the misleading impression

17    created by" CytoDyn's statements. *Id*. (citing *In re NeoPharm, Inc. Sec. Litig.*, 2003 WL

18    262369, *13 (N.D. Ill. Feb. 7, 2003) (TOTM defense rejected where "defendants

19    fraudulently downplayed the significance of [the news]" by not disclosing serious

20    "problems plaguing" drug)). The same is true here.

21        CytoDyn replies that its statements did reveal the relevant negative results and that

22    he has not pled or explained why investors were misled by its focus on the data it viewed

as positive, given its contemporaneous disclosure of the disappointing nature of the results as a whole. Dkt. 137 at 9. Here, it argues that Courter's "desire for additional context" does not render its statements misleading. *Id*.

The Court does not agree. Courter has plausibly and specifically pled that CytoDyn misleadingly spun the FDA's adverse decision as a demonstration of Leronlimab's efficacy, and a "green light" to proceed with clinical trials. The FDA understandably rebuked it because these statements were contrary to the truth, which was that there was no evidence of efficacy and formal trial were required to obtain usable data. CytoDyn's motion to dismiss Courter's Rule 10b-5(b) claim based on statements CytoDyn made about the COVID-19 eINDs is **DENIED**.

**b.    CytoDyn's CD10 statements.**

Courter alleges that CytoDyn's misleading statements about Leronlimab's use as a treatment for COVID-19 and the success of efforts to obtain FDA approval continued with respect to its CD10 Phase 2 clinical trial, between July 30, 2020, and April 14, 2021. Dkt. 132 at 26. He argues that Pourhassan misleadingly announced the CD10 had "positive efficacy results, a "statistically significant" difference "between Leronlimab and placebo," allowing it to seek EUA for COVID-19. Dkt. 132 at 26–27. Courter argues that CytoDyn created a misleading impression that CD10 was a success, and that it supported EUA, stating that it "demonstrated statistically significant results" in the "key NEWS2 secondary endpoint," and that it was the "first drug actually worked on COVID-19." *Id*. at 27. CytoDyn also announced it had "requested" EUA, based on CD10. Courter alleges that CytoDyn admitted to the FDA that the NEWS2 "mean baseline values were too low

1  to observe a clinically meaningful difference after treatment." He alleges that this means

2  CytoDyn already knew that Leronlimab was in fact no more effective than a placebo. He

3  contends that as a result, CytoDyn "fabricated" data to demonstrate efficacy, touting the

4  NEWS2 data to investors when it knew the FDA would not accept it. He claims these

5  statements are actionable *Id*. (citing *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d

6  983, 1019 (S.D. Cal. 2005) ("Defendants committed fraud by publicly reporting []

7  results" that were "so statistically flawed to lack clinical significance" and "portraying

8  the results" "in an unduly optimistic light.") *Id*. at 27.

9      CytoDyn argues again that it disclosed the relevant negative news: CD10 failed to

10  meet it primary endpoint. Dkt. 116 at 13 (citing August 11, 2020, Press Release, Dkt.

11  117-3). It argues that, again in context, Courter has not plausibly alleged that its emphasis

12  on the few pieces of data that it regarded as positive[3] were misleading, given the

13  contemporaneous disclosure of the disappointing news regarding the study as whole. *Id*.

14  at 13–14 (citing *Biogen Sec. Litig.*, 179 F.R.D. 25, 39 (D. Mass. 1997) (omissions not

15  material where company disclosed "the most relevant and disappointing aspect of the

16  [trial] results – the failure to reach the primary endpoint")).

17      Courter responds that though it disclosed the negative news, CytoDyn's

18  accompanying statements were nevertheless false and misleading. He argues that

19  statements touting positive trial data are actionable if the defendant knows but does not

20

21      ---
   [3] One such statement is: "We discovered that the secondary endpoint, that we believe is even more important than our primary endpoint, and we have achieved a statistically significance

22  value which is the so-called NEWS2." Dkt. 116 at 13.

1  disclose that the available evidence, if any, was "likely unreliable." Dkt. 132 at 28 (citing

2  *Khoja*, 899 F.3d at 1010 (failure to disclose that results had "high degree of uncertainty"

3  made them "appear[] more promising [to investors] than [defendant] allegedly knew they

4  were")). He asserts that statements asserting that a trial "demonstrated effectiveness

5  imply that the resulting data is "empirically valid and analytically sound" are actionable

6  if that data was instead the result of statistically unreliable analysis. *Id*. (citing *Frater*,

7  996 F. Supp. 2d at 346). He emphasizes he has plausibly alleged that CytoDyn

8  misleadingly implied that the CD10 data was sound and that it demonstrated efficacy, and

9  that it failed to disclose that it engaged in unreliable data manipulation. *Id*. (citing *In re*

10  *Myriad Genetics, Inc. Sec. Litig.*, 2021 WL 977770, *8-9 (D. Utah Mar. 16, 2021)

11  (statements about product's effectiveness misleading without statistically reliable efficacy

12  evidence); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, *13 (D.N.J. Aug.

13  28, 2017) (statements claiming data demonstrated drug's efficacy actionable where

14  "prespecified [] analysis *failed to produce such evidence*") (emphasis in original)).

15  Courter argues it is also misleading to attempt to pass off post-hoc analyses without

16  disclosing the true data, and the fact that it was using post-hoc analysis. *Id*. (citing *In re*

17  *PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, *13 (D.N.J. Aug. 28, 2017)).

18       He argues that CytoDyn relied on just this sort of post-hoc analysis to

19  "demonstrate" that Leronlimab was effective for COVID-19, despite knowing that the

20  true data showed it was no more effective than a placebo, attempting to "lull" investors

21  into thinking that the NEWS2 data was sufficient to meet FDA efficacy standards. *Id*. at

22  29–29 (citing *Frater*, 996 F. Supp. 2d at 343 (statements touting re-analysis of trial data

1    actionable where defendants did not disclose FDA's position that such post-hoc analysis

2    "would not ordinarily support approval.")).

3        Courter also argues that after the FDA corresponded about CD10 in September

4    and December 2020, CytoDyn made additional false and misleading statements about the

5    results of that trial. He alleges the FDA privately told CytoDyn in September that CD10

6    "did not meet any of" its endpoints or "provide any [efficacy] evidence" and the FDA did

7    "not recommend additional studies," but that CytoDyn responded by telling investors that

8    "we have hit two endpoints and that CD10 "awarded us a pathway to approval."

9        Courter also plausibly alleges that the FDA told CytoDyn at the time that it was

10   "relaying" "misinformation" because it was "not true" that CD10 met the NEWS2

11   endpoint. *Id.* at 29. Courter argues that CytoDyn's statements were misleading and

12   untrue. *Id.* (citing *Khoja*, 899 F.3d at 1010 (defendants touting positive trial results have

13   duty to disclose what FDA told them about results); *Arena*, 840 F.3d at 708

14   (representations that animal studies support approval actionable where defendants failed

15   to disclose FDA's concerns about data); and *CV Therapeutics*, 2004 WL 1753251 at *8

16   (motion denied where defendants "failed to reveal the depth of the FDA's concerns")).

17       Courter also relies heavily on the FDA's "unprecedented" May 17, 2021

18   "Statement on Leronlimab," Dkt. 117-1. He argues that the FDA had warned CytoDyn in

19   December 2020—five months after CytoDyn told investors that CD10 missed its primary

20   endpoints—that "the public" was "likely to understand that CDA) actually met its

21   endpoints," because of CytoDyn's misleading statements. He alleges that when the

22   FDA's May 17 Statement "debunked" CytoDyn's public statements about CD10,

1    CytoDyn's stock price declined sharply. He argues, again persuasively, that the "truth"

2    about the results of Leronlimab's clinical trials was not "in the marketplace" before the

3    FDA's Statement. *Id*. at 30–31.

4        The Court again agrees with Courter. He has plausibly, specifically pled that

5    CytoDyn falsely and misleadingly told investors that its CD10 trial demonstrated that

6    Leronlimab was effective against COVID-19, and it had not. It misleadingly failed to

7    disclose information that would have completed the context of the statements it did make.

8        CytoDyn's motion to dismiss Courter's Section 10b claim based on CytoDyn's

9    CD10 statements is **DENIED.**

10        **c.    CytoDyn's CD12 statements.**

11        Courter alleges that CytoDyn similarly made materially false and misleading

12    statements about CD12 between March 5 and October 13, 2021. He alleges CytoDyn

13    again told investors that CD12 demonstrated "statistically significant" results in several

14    trial subgroups, and that, as a result, CytoDyn had: (1) pathways to FDA approval and

15    was working with the FDA to expedite approval for COVID-19, and (2) had "filed" a

16    "request" for a conditional EUA. Dkt 132 at 31. He argues that these statements were

17    materially false and misleading: in truth, the FDA had twice rejected EUA, and warned

18    CytoDyn that because the subgroup analyses were "post-hoc" and did not provide

19    statistically reliable evidence, its public statements touting the results were "potentially

20    misleading." CytoDyn even acknowledged privately to the FDA that it needed more data

21    to statistically prove Leronlimab's efficacy. Dkt. 132 at 31.

22

1    Courter alleges that CytoDyn appreciated the gravity of the FDA's concerns yet

2    publicly mischaracterized those concerns. It told investors that the FDA "saw" what they

3    "saw" and that was a reason to go forward, when in truth the FDA questioned whether

4    further evaluation of Leronlimab for COVID-19 was warranted. *Id*. at 32. He similarly

5    alleges that CytoDyn told investors that the CD12 results were "good enough" for

6    another trial, without disclosing that it in fact the FDA was willing to consider such a trial

7    only if CytoDyn first demonstrated the scientific rationale with clinical data. Indeed, he

8    claims, while CytoDyn told investors the FDA allowed it to extend CD12 to generate

9    data for EUA or full approval, the FDA had already told CytoDyn that the data collected

10    under the extension could not support approval. *Id*.

11    CytoDyn again argues that it disclosed the primary, relevant negative news about

12    CD12 missing its endpoints, and that securities laws do not require issuers to focus on the

13    most negative outcomes or unnecessarily disparage themselves. Dkt. 137 at 9. It argues

14    that the market viewed CD12 as a failure and that in that context, its statements about

15    CD12 were not misleading. Dkt. 116 at 14.

16    Courter responds that he isn't challenging CytoDyn's disclosure of CD12's failure

17    to meet its endpoint, but rather its failure to disclose that its CD12 subgroup analyses

18    were unreliable and would not support approval. He argues, and the Court agrees, that the

19    "bad news" about the missed end point did not "counterbalance" the misleading

20    impression created by the other statements and omissions. Investors were still led to

21    believe that Leronlimab was effective against COVID-19—that it "worked." Dkt. 132 at

22    33 (citing *Warshaw v. Xoma Corp.,* 74 F. 3d 955, 958 (9th Cir. 1996) (claims sustained

1    where defendants reassured investors following FDA rejection of study about drug's

2    effectiveness and likelihood of FDA approval)). The FDA's May 17 Statement on

3    Leronlimab addressed the CD12 study, too, and similarly corrected the market's incorrect

4    "impressions" about its efficacy. Courter argues that if investors understood that CD12

5    was a failure, the FDA would not have had to issue its Statement, and the stock price

6    would not have plummeted when it did. Dkt. 132 at 34 (citing *Frater*, 996 F. Supp. 2d at

7    347 (requisite materiality demonstrated where stock price "plummeted" after "misleading

8    statements were contradicted by the FDA")).

9        Finally, Courter emphasizes that CytoDyn's TOTM defense does not apply to

10   Pourhassan's May 18, 2021, statement purporting to disclose the contents of non-public

11   FDA correspondence without also disclosing the existence, date, and content of three

12   prior private FDA letters denying EUA. *Id*. at 34 (citing *CV Therapeutics*, 2004 WL

13   1753251 at *8 ("once [defendant] started to reveal the contents of [his] conversations

14   with the FDA, [he] had the duty to be truthful.")). He argues, correctly, that Pourhassan's

15   claim that CytoDyn's prior CD12 statements were "not different" than the FDA's

16   statement fraudulently downplayed the existence and significance of issues he and it had

17   already discussed with the FDA. *Id*. (citing *CV Therapeutics*, 2004 WL 1753251 at *5).

18   Courter has plausibly pled that a reasonable investor would be misled reading CytoDyn's

19   statements, fairly and in context.

20       CytoDyn's motion to dismiss Courter's Section 10b claims based on its CD12

21   statements is **DENIED**.

22

### 3.    The PSLRA Safe harbor.

CytoDyn argues that other statements are not actionable because they were "forward looking" and included the required cautionary language; they are within the PSLRA "safe harbor." It argues that the safe harbor bars claims based on challenged statements reflecting expectations or predictions where (i) the statements were identified as forward-looking and accompanied by meaningful cautionary language; or (ii) a plaintiff does not plead facts showing that defendants had actual knowledge that the statements were false when made. Dkt. 116 at 15 (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1058 (9th Cir. 2014), and *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021-22 (9th Cir. 2005)).

Courter responds that he does not challenge forward-looking statements about future aspirations, but rather his claims are based on present- and past-tense statements about Leronlimab and its "path to approval." Dkt. 132 at 35 (citing *Fibrogen, Inc.*, 2022 WL 2793032, at *7 and *8 (statements highlighting results "available at the time," and those regarding past interactions with FDA, are "not forward-looking."); and *In re MannKind Sec. Actions,* 835 F. Supp. 2d 797, 817 (C.D. Cal. 2011) (same)).

Courter also argues that CytoDyn's boilerplate cautionary language is insufficient to invoke the safe harbor; it is not substantive and is not tailored to the specific challenged projections, estimates, or opinions. *Id*. at 36 (citing *In re Amylin Pharmaceuticals, Inc. Securities Litigation,* 2003 WL 21500525 at *7 (S.D. Cal. May 1, 2003). He argues that cautionary language is not meaningful if it discusses as a mere possibility a risk that has already materialized. Specific statements about the future that

were untrue based on current events and knowledge are not forward looking, and are outside the safe harbor. *Id*. (citing *Forescout,* 2023 WL 2532061 at *23 ("[d]efendants cannot rely on boilerplate language describing *hypothetical* risks to avoid liability for the failure to disclose that the company *already* had information suggesting the merger might not ensue.")). He argues that CytoDyn warned that it "might not be able to provide acceptable evidence of efficacy" when the FDA had already rejected its May 2020 BLA submission, and CytoDyn had no other "acceptable" evidence to submit.

Statements that relate to events that already occurred, or which involve "predictions" that were not possible based on information CytoDyn already had, are actionable. To the extent CytoDyn's safe harbor argument applies to the statements discussed above, its motion is **DENIED**.

### 4.    CytoDyn statements as opinion, puffery, or scientific disagreement.

CytoDyn similarly argues that some of its challenged statements[4] were expressions of opinion, "optimism," "mere puffery," or predictions of future events, and are not actionable. Dkt. 116 at 16–18.

It argues that statements including "We understand that the FDA's [sic] is requiring additional analysis of completed trials and results;" "I'm almost certain that [patients] have [been treated with leronlimab], as [the FDA] waived our waiting for pre-IND …. That's my guess;" and "In my humble opinion, there is no doubt that Leronlimab

---

[4] CytoDyn's motion includes a list of similar statements. Dkt. 116 at 17 n.11.

1   will be part of the future of COVID-19 therapies" are opinions, and that to be actionable

2   they must be both subjectively and objectively untrue. Dkt. 116 at 17 (citing *Omnicare,*

3   *Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015);

4   and *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.

5   3d 605, 615-16 (9th Cir. 2017)). CytoDyn argues that Courter has not plausibly pled that

6   the speaker did not subjectively believe his statement's contents, and a prediction that

7   turns out to be wrong does not render the statement untrue when made. *Id*. at 17–18

8   (citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir.1999) ("[i]t is clearly

9   insufficient for plaintiffs to say that [a] later, sobering revelation[] makes[s] [an] earlier,

10   cheerier statement a falsehood").

11       Courter argues first that he is not primarily challenging opinion statements; he is

12   challenging statements that expressed certainty about a thing or occurrence: "No

13   additional trials will be required;" "all the information the FDA has requested is

14   obtainable.". He argues that such statements are not opinions. Dkt. 132 at 37 (citing

15   *Omnicare* at 176 ("[A] statement of opinion conveys only an uncertain view as to that

16   thing.")).

17       Courter also contends that some of CytoDyn's opinion statements are actionable,

18   where he plausibly pleads

19       (i) both that "the speaker did not hold the belief she professed" and that the
        belief is objectively untrue; (ii) that a fact contained within an opinion

20       statement was untrue; or (iii) "facts going to the basis for the issuer's
        opinion," the omission of which rendered the statement misleading.

21

22

1    Dkt. 132 at 37 (citing *Align*, 856 F. 3d at 615-16)). He argues CytoDyn's opinion

2    statements include embedded facts about the FDA's communications to it, what actions

3    FDA took and why, and CytoDyn's NEWS2 data methodology, and that these facts can

4    be proven untrue by documents CytoDyn possessed at the time. *Id*. at 38. He argues that

5    CytoDyn said one thing about Leronlimab's COVID-19 MoA and efficacy but "held

6    back" other material facts going to the basis of the statements, and that the statements are

7    thus actionable. *Id*. (citing *Intuitive Sugical*, 2017 WL 4355072 at *4–5).

8         Courter has plausibly pled that, in context, the speaker could not have subjectively

9    believed the factual underpinnings CytoDyn's "opinions;" the public statements did not

10   fairly align with information in CytoDyn's possession. CytoDyn's motion to dismiss

11   these statements as opinion is **DENIED**.

12        CytoDyn also argues that "mere puffery" is not actionable. It argues its optimistic

13   expressions about Leronlimab's efficacy for HIV or COVID-19 are not capable of

14   objective verification, and are thus not actionable. Dkt. 116 at 16 (citing, among others,

15   *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) ("transparently

16   aspirational" statements are inactionable because investors "know how to devalue the

17   optimism of corporate executives")).

18        Courter responds, persuasively, that the statements he challenges are not mere

19   puffery where CytoDyn was aware of facts rendering the optimistic statements false or

20   misleading. Dkt. 132 at 40 (citing *In re Splunk Inc. Sec. Litig.,* 592 F. Supp. 3d 919, 941

21   (N.D. Cal. 2022). He also argues that expressions of optimism or confidence about trial

22   data is actionable when it concerns and contradicts existing data undermining that

optimism. He argues that CytoDyn's statements about the eINDs conveyed false or

misleading language about efficacy when the facts did not support any such claim. *Id*.

And he argues that statements of "general optimism, when taken in context, may form a

basis for a securities fraud claim." *Id*. (citing *Forescout,* 2023 WL 2532061 at *14).

The Court agrees. The same is true with respect to CytoDyn's argument that its

statements reflected only "scientific disagreement" with the FDA. That is not what it told

investors, and it has not argued or demonstrated why its optimism was warranted based

on the data or its discussions with the FDA. It does not contend that it disagreed with the

FDA, and indeed Courter has plausibly pled that CytoDyn acknowledged to the FDA that

its data was not sufficient. CytoDyn's motion to dismiss its statements as mere puffery is

**DENIED**.

**5.      Courter's Section 10(b) false statement claims against Kelly and Mulholland.**

Kelly and Mulholland seek dismissal of Courter's Section 10b claims against them

individually for the additional reason that the statements upon which he relies were, with

two exceptions, not made by[5] either of them. Dkt. 116 at 20–22. They argue that

Mulholland made none of the statements and that Courter's claim he participated in

drafting them is insufficient: "playing "some role in the drafting, approving, and/or

publishing of" allegedly false statements "is not enough to create liability under Section

10(b)." Dkt. 116 at 21 (citing *In re Impinj, Inc., Sec. Litig*., 414 F. Supp. 3d 1327, 1335

---

[5] Pourhassan joins the motion, Dkt. 123, but does not argue that he did not make the challenged statements; Courter has plausibly alleged that he did. His motion to dismiss Courter's claims on this basis is **DENIED**.

1   (W.D. Wash. 2019)). But *Impinj* cannot fairly be read so broadly. In context, the Court

2   explained:

> The "maker" of a statement is "the person or entity with ultimate authority
> over the statement, including its content and whether and how to
> communicate it." [*Janus*, 564 U.S. at 143 and 145] A behind-the-scenes
> contributor to another's statement, such as a speech writer or one who
> provides false or misleading information that is incorporated into the
> statement, does not "make" the statement if the actual speaker or author
> ultimately controls the content and publication of the statement.

7   *Impinj* at 1335. Courter has plausibly pled that Mulholland had more that "some role" in

8   drafting allegedly false and misleading statements CytoDyn submitted to the SEC; he

9   signed them, repeatedly. And, as discussed below, Courter has plausibly pled that Kelly

10  and Mulholland were CytoDyn control persons.

11         Kelly argues that his statements about the NEWS2 findings in CD10 were a non-

12  actionable difference of opinion regarding the interpretation of the clinical trial data. *Id*.

13  at 21–22. He argues Courter has not pled facts plausibly demonstrating that Kelly did not

14  genuinely believe his opinion statements about Leronlimab. *Id*.

15         Courter responds that while he does not seek to hold Kelly or Mulholland liable

16  under Section 10b for statements they did not make, he does plausibly plead that each

17  routinely signed CytoDyn's SEC filings. Dkt. 132 at 20 n7 (citing *Howard v. Everex Sys.,*

18  *Inc.*, 228 F.3d 1057, 1061 & n.5 (9th Cir. 2000) ("a corporate official…who, acting with

19  scienter, signs a[n] SEC filing containing misrepresentations, makes a statement" and is

20  liable under Section 10(b)"). Courter's SAC and brief are also flush with other plausible

21  allegations tying Kelly and Mulholland to CytoDyn's false and misleading statements.

22

1      The Court again agrees with Courter. Kelly and Mulholland's motion to dismiss

2   Courter's Section 10b claims (Count I) against them is **DENIED**.

3   **C.      Count II – Section 10(b) stock promotion scheme (Rule 10b-5(a) and (c)).**

4      Courter alleges that not only did CytoDyn, Kelly, Mulholland, and Pourhassan

5   violate Section 10b and Rule 10b-5(b) by "making" false statements about Leronlimab

6   and their efforts to obtain FDA approval to use it to treat HIV and COVID-19, he alleges

7   a Rule 10b-5(a) and (c) claim based on defendants' fraudulent "scheme" to "promote"

8   these statements, to maintain or increase the price of CytoDyn's stock. Dkt. 132 at 41. He

9   asserts that during the first week of the class period, for example, CytoDyn issued seven

10  COVID-19 press releases (PRs) containing misrepresentations, sent those PRs to

11  promotional outlets and potential investors, and paid promotional outlets to amplify them.

12  Dkt. 132 at 41. He alleges CytoDyn paid Proactive Investors to interview Pourhassan and

13  Patterson[6] three times, and that they made additional misrepresentations during those

14  interviews. *Id*. Courter alleges that the scheme worked: an analyst doubled its target price

15  for CytoDyn stock; Pourhassan forwarded an article to a paid promoter "to distribute,"

16  and the promoter "blasted our biotech data base and cydy shareholders." *Id*. Courter

17  alleges that on April 21, 2020, CytoDyn's stock closed above $3.00 for the first time in

18  nine years, and that Pourhassan and Kelly internally acknowledged that the spike was the

19  result of "people seeing" his interview on Yahoo finance. *Id*. And Courter asserts that

20

21      [6] Courter alleges that Dr. Patterson was a CytoDyn representative and consultant from
    October 2018 to May 2020. He is not a defendant, though Courter alleges he was CytoDyn's
22  agent.

1   when the relevant truth was revealed, the stock price again declined, causing damage to

2   investors. *Id*.

3       CytoDyn seeks dismissal of this claim, arguing that Courter fails to identify any

4   loss to investors from the purported stock promotion scheme distinct from the stock price

5   drops associated with the allegedly "corrective disclosures" of statements he challenges

6   under Rule 10b-5(b). Dkt. 116 at 22 (citing *Stoneridge*, 552 U.S. at 159) (plaintiff must

7   satisfy each of the elements for liability, including "(5) economic loss; and (6) loss

8   causation")). CytoDyn argues that Courter's scheme claim is based on the same

9   statements he already challenged under Rule 10b-5(b), and that he has not and cannot

10  plausibly plead that the "promotion" of these statements affected the stock price

11  separately from the market reaction to the statements themselves. *Id*. at 23.

12      It also asserts that press releases and reiterating third party statements are

13  commonplace and lawful, and that it disclosed[7] its relationship with paid consultants. It

14  argues there is nothing "inherently deceptive" about this conduct. *Id*. at 23–24 (citing

15  *SEC v. Chen*, 2019 WL 652360, at *18 (W.D. Wash. Feb. 15, 2019)). It argues that

16  Courter is required, and failed, to plead loss causation with particularity. *Id*. at 24 (citing

17  *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 605 ("Rule 9(b) applies to all elements of a

18  securities fraud action, including loss causation")). It argues that Courter has not

19  demonstrated that Pourhassan's forwarding an allegedly misleading third-party video

20  affected the stock price or caused damage to him. *Id*.

21  _____

22      [7] Courter argues this "premature" factual dispute cannot be resolved on a motion to
    dismiss. Dkt. 132 at 44 n.33.

1    Courter responds that he is not required to allege "distinct" loss causation for

2    claims under each subsection of Rule 10b-5. Instead, he asserts, his allegations of

3    scienter, reliance, causation, and damages supporting liability under Section 10(b) are

4    relevant to one or all of Rule 10b-5's sub-sections. *Id.* at 42 (citing *Lorenzo*, 139 S. Ct. at

5    1097, and *FirstEnergy*, 2022 WL 681320 at *26 ("Defendants' misrepresentations and

6    omissions—and the presumptions that attach to them—are relevant for scheme

7    liability")).

8    Courter identifies six "partially corrective events" that revealed the truth about

9    CytoDyn's actual (lack of) progress in obtaining FDA approval for Leronlimab between

10    March 5, 2020, and March 30, 2022, including: the incomplete BLA, the FDA's RTF

11    letter, the fact CytoDyn had *not* requested EUA, the FDA's Statement on Leronlimab,

12    and, ultimately, the clinical holds. He alleges, plausibly and accurately, that CytoDyn's

13    stock declined each time the truth came out. He argues that he has plausibly pled

14    causation for both his Rule 10b-5(b) and his Rule 10b-5(a&c) claims. Dkt. 132 at 43

15    (citing *Smith v. Lifevantage Corp.*, 341 F.R.D. 82, 107-08 (D. Utah 2022); and

16    *FirstEnergy*, 2022 WL 681320 at *29 (finding causation for Rule 10b-5(a&c) conduct

17    over "a series of disclosing events")). *Id.*

18    Courter also plausibly alleges that CytoDyn's conduct in drafting, disseminating,

19    and repeating statements that CytoDyn, Mulholland, Kelly, and Pourhassan knew were

20    false, are inherently deceptive acts. He argues his second amended complaint thoroughly

21    catalogues the statements and why defendants knew they were false, how they impacted

22    the stock price, and how the subsequent truth impacted that price. He accurately asserts

that he need only show "representative examples" of a "complex and far-reaching fraudulent scheme." *Id*. at 44 (citing *FirstEnergy*, 2022 WL 681320 at *1).

Courter also argues that CytoDyn is liable for the fraudulent conduct of Lalezari, Dhody, and Patterson, under traditional agency principles that apply in this context, even after *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Dkt. 132 at 45-46 (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) ("Nothing in *Janus* undid the long-standing rule that 'a corporation is liable for statements by employees who have apparent authority to make them.'")).

CytoDyn correctly contends that it is not liable for any statements these non-parties made when they were not employed by CytoDyn, but it does not otherwise persuade the Court that it is not liable for its agent's false and misleading statements.

CytoDyn's motion to dismiss Courter's Rule 10b-5(a&c) "promotion scheme" claim (Count II) is **DENIED**.

**D.    Count III – Section 20(a) control person liability.**

Courter alleges a Section 20a "control person" liability claim against Kelly, Mulholland, and Pourhassan, based on their Section 10(b) conduct. He correctly contends that to plead such a claim, he must allege (i) a Section 10(b) violation and (ii) that the defendant controlled the person liable for that violation. Dkt. 132 at 47 (citing *Alphabet*, 1 F. 4th at 701-702)). He emphasizes that whether a defendant is a "control person" is "an intensely factual question," and that Federal Rule of Civil Procedure 8(a)'s "relatively lenient" pleading standards apply to this claim. *Id*. (citing *Howard v. Everex Sys., Inc.*,

228 F.3d 1057, 1065 (9th Cir. 2000), and *Petrie v. Elec. Game Card Inc.*, 2011 WL

165402, \*6 (C.D. Cal. Jan 12, 2011), respectively).

Kelly and Mulholland seek dismissal of this claim, arguing that even if Courter

has plausibly pled the CytoDyn violated Section 10(b), he has failed to plead with

particularity that either of them had the requisite control over the challenged conduct.

Dkt. 116 at 25. They argue that in this context "control" means "the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a

person, whether through the ownership of voting securities, by contract, or otherwise."

*Id*. (citing 17 C.F.R. § 230.405). They argue that Courter's claim they "reviewed" and

"approved" certain challenged statements "does not rise to a level of supervision or

participation sufficient for a Section 20a violation." *Id*. (citing *Howard* at 1067 n.13).

They point out that Courter has also alleged that Pourhassan (alone) exercised so much

control over CytoDyn's operations that he "pushed out" board members who questioned

his actions, suggesting that this implies that no one else possessed such control. *Id*.

The plausibility of Courter's claims about CytoDyn's Section 10b violations is

discussed above. Courter argues he has adequately pled that each individual defendant

controlled CytoDyn as corporate officers, and "were involved in drafting, producing,

reviewing, and or dissemination of the allegedly false and misleading statements." Dkt.

132 at 48 (citing *Amgen* 544 F.Supp.2d at 1037)). He points out that *Howard*, the case

upon which defendants' motion heavily relies, involved the *reversal* of an order

dismissing a CEO because he "had authority over the process of preparing and releasing

the financial statements," and he signed them. *Id*. (citing *Howard* at 1065). He argues that

1  Kelly and Mulholland did the same, and that he has similarly pled a plausible control

2  person claim against them.

3        The Court again agrees with Courter. He has plausibly pled that Kelly,

4  Mulholland, and Pourhassan "controlled" CytoDyn and are thus liable under Section 20a

5  for the company's Section 10b violations. The individual defendants' motion to dismiss

6  this claim (Count III) is **DENIED**.

7  **E.**    **Count IV – Section 20A insider trading.**

8        Finally, Courter asserts a Section 20A insider trading claim against Kelly,

9  Mulholland, and Pourhassan. He contends that each violated Section 10b, that each

10  possessed material, non-public information (MNPI) when he sold CytoDyn stock, and

11  that Courter (and the other named plaintiffs) engaged in "contemporaneous" trading

12  activity. Dkt. 132 at 49 (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,

13  711 (9th Cir. 2012).

14        The individual defendants seek dismissal of this claim. They argue that Courter

15  must plausibly and specifically establish that that they each violated securities laws, each

16  acted with scienter, and each sold CytoDyn stock while in possession of material, non-

17  public information (MNPI). Dkt. 116 at 25 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d

18  1027, 1035 (9th Cir. 2002) (plaintiff must plead scienter with particularity for Section

19  20A claim)). They argue that because Courter has failed to state a plausible Section 10(b)

20  claim against them, his insider trading claim necessarily fails. *Id*. (citing *In re Petco*

21  *Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *35 (S.D. Cal. Aug. 1, 2006)

22  (dismissing Section 20A claims against parties dismissed from Section 10b claims).

1    Defendants do not strenuously dispute that they possessed MNPI when they sold

2    stock, and their latter argument is foreclosed by the Court's conclusion above that

3    Courter has plausibly pled that Kelly, Mulholland, and Pourhassan violated Section 10b

4    by making false and misleading statements with scienter.

5    Defendants also argue that Courter has not plausibly pled that Mulholland or

6    Kelly[8] "actually used" the MNPI in making the alleged trades. Dkt. 116 at 26 (citing *In re*

7    *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202-203 (C.D. Cal. 2008)

8    (for Section 20A claim, "[s]cienter and loss causation … requires that the insider *actually*

9    *use* … the inside information in deciding to make the trade").

10    Mulholland emphasizes that, as Courter concedes, his trades were pre-arranged

11    under a Rule 10b5-1 trading plan not involving any discretion, rebutting any inference of

12    scienter. *Id*. (citing *Metzler*, 540 F.3d at 1067 n.11, and *In re Nektar Therapeutics*, 2020

13    WL 3962004, at *16 (N.D. Cal. July 13, 2020) (sales made under Rule 10b5-1 trading

14    plans weigh against "an inference of scienter"). Mulholland argues that by the time he

15    committed to his trading plan, leading to the November 2020 sales at issue, CytoDyn had

16    already disclosed, and the market had already reacted to, the material and major negative

17    news of which Courter complains. Dkt. 116 at 26. He argues that the price at which he his

18    pre-planned sales occurred—roughly 30% lower than the stock's class period high—

19    undercuts any inference that the sales were "calculated to maximize the personal benefit

20    from undisclosed inside information." *Id*. at 27 (citing *Ronconi v. Larkin*, 253 F.3d 423,

21    _____

22    ⁸ Pourhassan joins this argument, Dkt. 123, but he does not articulate why Courter's
claims against him similarly fail. His motion on this basis is **DENIED**.

1    435 (9th Cir. 2001) (sales do not support scienter "[w]hen insiders miss the boat this

2    dramatically")).

3    Kelly argues that Courter has failed to plausibly plead that when he sold stock on

4    May 1, 2020, he personally knew that the April 27 BLA submission did not include the

5    clinical datasets that CytoDyn later submitted in May. He points out that the FDA's

6    correspondence about that deficiency was sent to Amarex and Pourhassan, not to him. He

7    claims Courter does not allege that it was then sent to him, much less that he received it

8    before he traded. Dkt. 116 at 27.

9    Pourhassan joins Kelly and Mulholland's final argument that Courter has failed to

10    plausibly plead that he "contemporaneously" traded with Kelly or Mulholland. They

11    argue that this requires (or should require[9]) a plaintiff to allege that he traded on the

12    "same day" as the insider, and that with limited exceptions, Courter has not so pled. *Id*. at

13    50 (citing *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995)

14    (insider's sale and plaintiff's purchase must occur on the same day; "[t]he same day

15    standard is the only reasonable standard given the way the stock market functions.")). It

16    argues that the Courter has alleged only two same day trades, in which plaintiffs Hooper

17    and McGee purchased CytoDyn stock at a price *lower* than Mulholland sold his stock.

18    Dkt. 116 at 28.

19    Courter responds that the Ninth Circuit has not defined "contemporaneous" as

20    "same day" trading, and that other district courts in the Circuit have more recently

21    _____

22    [9] The Court declines CytoDyn's invitation to "adopt" the same day standard. Dkt. 137 at 16.

ORDER - 39

1    concluded that trades made withing days are sufficiently contemporaneous. Dkt. 132 at

2    49 (citing *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, *12 (N.D. Cal. Feb. 27,

3    2018) (two days); *Johnson v. Aljian*, 257 F.R.D. 587, 595 (C.D. Cal. 2009) (four days);

4    *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 (N.D. Cal.

5    2019) (six days)).

6         Courter correctly contends that scienter is an element of the predicate Section 10b

7    violation, but it is not a separate element of a derivative 20A claim. *Id*. at 49–50 (citing

8    *VeriFone*, 704 F.3d at 711; and *Lipton* at 1035).

9         Courter asserts that, accordingly, he need not establish *why* the sales occurred, or

10   that each seller "used" the MNPI in his possession; Section 20A requires only that a party

11   *know* the inside information when he trades. *Id*. at 50 (citing *Thomas v. Magnachip

12   Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1050 (N.D. Cal. 2016) (rejecting

13   *Countrywide*'s analysis, upon which Defendants rely); and *Steginsky v. Xcelera Inc.*, 741

14   F.3d 365, 370 (2d Cir. 2014) ("it is not necessary to show that corporate insiders *used* the

15   nonpublic information; it is sufficient to prove that they traded their corporation's

16   securities while knowingly in possession of [MNPI]").

17        The lack of a separate scienter requirement for 20A claims also undermines

18   Mulholland's claim that the pre-planned nature of his sale his means he acted without

19   discretion and thus without scienter. Courter argues persuasively that Courts have refused

20   to dismiss on this basis because it would "require accepting 'proof of the disputable

21   conclusion that [the Rule 10b5-1 plan] rule[s] out the possibility of trading based on

22

1   nonpublic material information.'" *Id*. (citing *McKesson*, 411 F. Supp. 3d at 605, n.3

2   (citing *Khoja*, 899 F.3d at 999)).

3          And finally, Courter argues that Kelly's discrete claim that he was unaware of

4   specific MNPI about the FDA's view that CytoDyn's April 2020 BLA did not have

5   required "clinical datasets" does not negate the plausibly-pled conclusion that he

6   possessed ample MNPI about the BLA and the COVID-19 IND when he traded. *Id*.

7          The Court again agrees with Courter. Scienter is part of the predicate 10b

8   violation, but it is not separately required with respect to a 20A sale made with MNPI.

9   "Contemporaneous" does not necessarily mean "same day," and the fact that

10  Mulholland's sale was pursuant to a Rule 10b5-1 plan is not a defense to a 20A claim,

11  where Courter has plausibly pled a Section 10b violation and the possession of MNPI.

12  The motion to dismiss Courter's 20A claim (Count IV) is **DENIED**.

13                                          ***

14         Courter's claims are plausible, measured against the heightened standard

15  applicable to his SAC. Defendants' CytoDyn, Kelly, Mulholland and Pourhassan's

16  motions to dismiss, Dkts. 116 and 123, are **DENIED**.

17         **IT IS SO ORDERED**.

18         Dated this 25th day of June, 2025.

19                                          _____

20                                          BENJAMIN H. SETTLE
                                            United States District Judge

21

22